**THOMAS v. SLAVENS.**

No. 10152.

Circuit Court of Appeals, Eighth Circuit. June 8, 1935.

Rehearing Denied July 15, 1935.

O. C. Mosman, of Kansas City, Mo. (Clay C. Rogers, C. Jasper Bell, and Paul A. Buzard, all of Kansas City, Mo., on the brief), for appellant.

Harry G. Kyle and Horace G. Pope, both of Kansas City, Mo., for appellee.

Before GARDNER, SANBORN, and FARIS, Circuit Judges.

GARDNER, Circuit Judge.

This is a personal injury case, in which appellee, as plaintiff below, recovered judgment for $1,750 as damages for injuries inflicted on him when he was struck by defendant's truck as it was being backed out of a driveway at the side of the house in which appellee lived. The parties will be referred to as they appeared below.

The only issue presented is the alleged error of the court in refusing to direct a verdict for defendant. The instructions, while excepted to, are not challenged in this court, and the only question raised is whether or not the driver of the truck was at the time of the accident resulting in plaintiff's injuries, acting within the scope of his employment.

The jury having found for plaintiff, we must view the evidence in a light most favorable to him, and give him the benefit of such favorable inferences as may reasonably be drawn therefrom. So viewed, the evidence establishes in substance the following facts: Defendant, Horace Thomas, lives at Pleasanton, Kan., and was the owner and operator of a truck line between Pleasanton, Kan., and Kansas City, Mo. He employed from time to time Glen Warnicke as a driver, and on the occasion here considered he employed Warnicke to drive a truck on a trip to Kansas City, Mo., and return to Pleasanton, Kan. Defendant says of Warnicke: "He was hauling livestock to Kansas City and then merchandise back." On February 10, 1932, at about 7 o'clock p. m., Warnicke left Pleasanton, bound for Kansas City, driving defendant's truck, which was loaded with furniture, a calf, and some barrels. The furniture belonged to plaintiff, and was to be delivered to him at his home in Kansas City. The calf was to be transported to the Kansas City stockyards, where it was to be delivered the following morning, but the evidence does not show what disposition was to have been made of the barrels nor what they contained. On this trip Warnicke was to bring back a load of merchandise. He was accompanied to Kansas City by Ralph Staton, a brother-in-law of plaintiff.

They arrived at plaintiff's place of abode at 3001 Oak street, Kansas City, about 10:30 p. m. The house was a duplex, and plaintiff and his wife lived up stairs, while another family lived down stairs. It faced west on Oak street. Warnicke drove the loaded truck up in front of the house, and he, Staton, and plaintiff unloaded the furniture and carried it up stairs and placed it in the rooms occupied by plaintiff and his wife. A little later, and after the furniture had been unloaded, Warnicke, on his own volition, and without suggestion from plaintiff, moved the truck so that "there would not be any chance of being pinched for leaving the truck there," into a driveway on the south side of the house. In the meantime Warnicke had placed a tarpaulin over it, as there was a

drizzling rain. The evidence is in some confusion as to just what was said between Warnicke, Staton, and Slavens. Staton says: "Warnicke came back upstairs. They insisted on us staying for dinner, and we told them no, we would go down on 31st Street and get a lunch there. We went downstairs and got in the truck and started to back out." There was some difficulty in getting the engine of the truck started.

Soon after Warnicke and Staton left plaintiff's rooms, plaintiff went down stairs, intending to go to a near-by store for some cigarettes, and in passing on the sidewalk opposite the driveway was struck by defendant's truck as it was being backed out by Warnicke.

Something is said in brief of counsel as to Warnicke's purpose to remain overnight with plaintiff, but, although Warnicke was a witness for defendant, he makes no such claim, and he did not return to stay there, and neither did he store his truck in the driveway for the night, and there is no evidence as to where he kept the truck with the balance of the freight, nor where Staton stayed that night. Plaintiff's testimony on this point is as follows:

"Q. And they were going, both of them, to stay all night with you? A. I don't know if they said or not but the way they talked they said, 'I have got the tarpaulin over it and I put it in the driveway,' and I figured it was all right if they wanted to stay."

The details of the accident are not here material, because the only issue presented is as to whether or not Warnicke was at the time acting within the scope of his employment. The court, by definite, specific instructions to which no exceptions are here urged, left it to the jury to determine whether at the time of the accident Warnicke was acting within the scope of his employment. In the course of these instructions the court said: "He (the servant) may depart or deviate from the strict course of his employment that accomplishes things that belong to him, of his own ends, and still if his master's work is in view all the time and before him, and if it is one of the processes whereby he performs his master's work, then, even though there is a deviation or a departure from the strict course of his master's business, yet if this is a temporary departure, and I say even for his own purposes, yet with-in the law he is yet acting for his master and within the scope of his employment."

Again it is said: "Now, then, you should take into consideration all the facts and circumstances, the circumstances that the witness Warnicke had the truck in his care and keeping; that it was for him to control the movements of the truck—such would be the implied authority. At least, you may infer that it was the implied authority that was given by his master, his employer, when he left home, to use the truck and place it and store it and keep it at such place as his own judgment might dictate. I inferred from the testimony it was contemplated he would deliver the goods that evening and next morning deliver the calf at the stockyards and then return home, and there was some testimony that he would bring some goods back to Pleasanton, which he may or may not have done."

The court then said that Warnicke was the servant of the defendant from the time he left home until he returned, "unless he departed from that service for purposes of his own, under circumstances that would destroy the relationship temporarily." The court also in its instructions said: "And, of course, gentlemen, in this case it would be within your province to find if, when he went out with the truck, that he went out to get something to eat, that that was not such a departure as would take away and destroy the relationship of master and servant. I am saying that that departure would not necessarily relieve the master of liability. You consider all of the facts in the case to determine whether or not he was within the scope of his employment at the time, even though it was a temporary departure or deviation from the strict line of business of his master, and that it was for his own purpose, that is to feed himself, to take nourishment, and, of course, being reasonable men you would contemplate yourself, that when a servant goes out, an employee on behalf of the master, you understand that those departures are made necessary for the sustenance of life. You would consider all those."

As has been observed, the period of Warnicke's employment was to continue from the time he took charge of this truck at Pleasanton, Kan., until he should return with it to Pleasanton, it being the plan to transport a load of merchandise on the return trip. It is important to bear in mind that Warnicke had not even com-

pleted the delivery of his freight which he was hauling from Pleasanton to Kansas City. At the time of the accident, there still remained in the truck undelivered the calf and the barrels.

■ The act of a servant, done to effect some independent purpose of his own, wholly disconnected with his employment, temporarily suspends the relation of master and servant, and the master is not liable for his acts during such time; but to relieve the master from liability of his servant's acts, on the ground that he has deviated from the scope of his employment, the deviation must be so substantial as to constitute an entire departure from such employment for purposes entirely personal to the servant; and, where the servant, notwithstanding the deviation, is still to some extent engaged in the master's business within the scope of his employment, it is immaterial that he may also have combined with this some private purposes of his own.

■ Whether there has been a deviation from the scope of the servant's employment so material or substantial as to constitute a departure therefrom is usually a question of fact to be decided by the jury. Of course, the deviation might be so marked or so slight as to warrant the court in concluding as a matter of law that the act was or was not a departure; but, where the deviation is uncertain in extent and degree, or where the surrounding facts and circumstances leave room for legitimate inferences as to whether or not, notwithstanding the deviation, the servant may still be engaged in the master's business within the scope of his general employment, then the question is a jury one, and each case must be determined with a view to its surrounding facts and circumstances. Silent Automatic Sales Co. v. Stayton (C. C. A. 8) 45 F.(2d) 471; Western Union Tel. Co. v. Dubell (C. C. A. 3) 69 F.(2d) 149; Shearman & Redfield on Negligence (5th Ed.) § 147; Rahn v. Singer Mfg. Co. (C. C.) 26 F. 912; Singer v. Rahn, 132 U. S. 518, 10 S. Ct. 175, 33 L. Ed. 440; Mandes v. Midgett, 49 App. D. C. 139, 261 F. 1019; D'Aleria v. Shirey (C. C. A. 9) 286 F. 523; Blashfield, Cyclopedia Automobile Law, vol. 2, p. 1409; Ritchie v. Waller, 63 Conn. 155, 28 A. 29, 27 L. R. A. 161, 38 Am. St. Rep. 361; Wrightsman v. Glidewell, 210 Mo. App. 367, 239 S. W. 574; Gordner v. Screw Co., 201 Mo. App. 349, 210 S. W. 930; Tutie v. Kennedy (Mo. App.) 272 S. W. 117; Snyder v. Western Union Tel. Co. (Mo. App.) 277 S. W. 362; Gulf Refining Co. v. Railway Co. (Tex. Civ. App.) 261 S. W. 169; Dale v. Armstrong, 107 Kan. 101, 190 P. 598; Johnson v. Sullivan's Delivery, 183 Wis. 460, 198 N. W. 367; Schrayer v. Bishop & Lynes, 92 Conn. 677, 104 A. 349; "An Automobile Accident Suit," by Walter H. Anderson, pp. 658 & 660.

■ Warnicke was responsible to the defendant, not only for the truck, but for the freight which he had transported and had not yet delivered. He apparently remained at the plaintiff's residence only a very few minutes after making his delivery there, because it appears from the undisputed evidence that he arrived about 10:30 and the accident happened about 11 o'clock. It was to protect his employer's property and the property which he was transporting that he drove the truck into the driveway. It was in contemplation of the parties that he should eat. There was no fixed time at which it can be said he terminated his relations to the defendant and went off duty, and, in fact, so far as the protection of the property in his charge was concerned, he was not relieved from responsibility until that property had been delivered. When he left the plaintiff's home, taking the truck with him, it cannot be said as a matter of law that he abandoned or departed from his employer's business. He was still in possession and presumably caring for both the truck and the undelivered freight. It was the duty of some one to care for the undelivered part of the cargo on this truck. The owner was miles away, but Warnicke, though away from his home and away from the home and headquarters of his employer, was in charge of the property and responsible for its care, and, so far as appears from the evidence, the jury may well have believed that he had not yet parked or stored the truck in a suitable place. Neither is there anything in the evidence to warrant the presumption that it was not in contemplation of the parties that he should eat during this employment, nor that he might not, while still in defendant's employment, drive this truck to some convenient and appropriate place where he might eat.

We are of the view that the jury may properly have found that at the time of the accident Warnicke had not turned com-

pletely aside from or abandoned the affairs of the defendant. The court, therefore, properly denied defendant's motion for a directed verdict. The judgment appealed from is affirmed.